IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TAMMIE CATHEY,                      )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        1:13cv543
                                    )
WAKE FOREST UNIVERSITY BAPTIST      )
MEDICAL CENTER,                     )
                                    )
                Defendant.          )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Before the court is the motion for summary judgment filed by
Defendant Wake Forest University Baptist Medical Center
("Baptist") on Plaintiff Tammie Cathey's disability discrimination
claims. (Doc. 17.) For the reasons set forth below, the motion
will be granted in part and denied in part.

## I. BACKGROUND

The undisputed facts, viewed in the light most favorable to
Cathey as the non-moving party, are as follows:

Cathey worked for Baptist from July 1996 to May 13, 2011.
(Doc. 22-5 (Cathey Decl.) ¶ 2.) When Cathey began working there,
the number of Baptist's Spanish-speaking patients was growing.
(Doc. 19-2 (Smith Dep.) at 23.) During this time, Baptist relied
on its employees, including Cathey, who happened to speak Spanish
to help interpret. (Id.) The need for interpreters eventually
became so great that in 1998 Baptist transferred Cathey to the

service excellence department as Baptist's first, full-time interpreter. (Id. at 25–26; Cathey Decl. ¶ 3.) Since that time, the department has grown and now employs eleven Spanish interpreters. (Smith Dep. at 27–28.) The majority of the time the interpreters are at work, they provide "live interpreting services"; by contrast, the time interpreters spend interpreting telephone calls is "very minimal," less than two percent of their time. (Dorton Dep. at 29–30, Doc. 22-1; Cathey Dep. at 138, Doc. 22-4.)[1]

One of the interpreters Baptist added was Linda Dorton. Eventually, Dorton, who speaks Spanish as a first language, was promoted to manager of language services and now supervises the interpreters. (Dorton Dep. at 16–20, Doc. 19-4; Smith Dep. at 30–32.) At the time of the incident at issue, the interpreters reported to Dorton, who reported to Terri Childress, who reported to Amanda Smith. (Dorton Dep. at 20–22, Doc. 19-4.)

Cathey suffers from hearing loss. In several conversations from 2007 to 2009, Cathey told Dorton that she was having difficulty hearing patients face-to-face and callers over the phone, and she had particular difficulty using a type of phone found in the human resources department (regardless of the language

---

[1] The parties have separately submitted various portions of the transcripts from Cathey's and Linda Dorton's depositions. The court will reference the docket entry number to show the proper source.

of communication).  (Cathey Dep. at 97, Doc. 22-4.)  Dorton provided her a hearing device called a "Pocket Talker" to amplify sounds, but it did not help.  (Cathey Dep. at 111, Doc. 19-1; Dorton Dep. at 82-83, Doc. 19-4.)  Dorton also suggested that Cathey use a sound amplifier on her phone, but she declined because the volume button for the phone at her desk was sufficient so long as there was not significant background noise or nearby conversation.  (Cathey Dep. at 112, Doc. 19-1.)

Cathey then sought hearing aids.  In 2009, she made an informal inquiry with Baptist's human resources department about a possible insurance waiver to help cover the cost, but was told that would not be possible.  (Cathey Dep. at 99, 102, Doc. 22-4.)  In 2010, she made a formal request to Dana Hughes in human resources for hearing aids to assist her.  (Id. at 102.)  Ultimately, Baptist provided Cathey with hearing aids; the cost was $5,100.00, and Cathey was required to pay ten percent.  (Id. at 106-07.)  From that point on, Cathey always used the hearing aids at work.  (Id. at 108.)

Meanwhile, in 2009, Dorton began advocating that Baptist employ a language proficiency test for its interpreters.  (Dorton Dep. at 43-46, Doc. 19-4.)  Cathey herself had, over the years, advocated for a standard to test the skills of medical interpreters and translators.  (Cathey Dep. at 60, Doc. 22-4.)  Previously, the interpreters had been evaluated "face-to-face."  (Id. at 145-46.)

To set new standards and methods of evaluation for the interpreters, Dorton organized and led a committee of human resources employees. (Dorton Dep. at 47–51, Doc. 19-4.) In the language interpretation and translation industry, the American Council on the Teaching of Foreign Languages ("ACTFL") creates guideline levels of language proficiency. (Id. at 42.) Separately, there are businesses that provide language examination services using the proficiency guidelines set by ACTFL. (Id. at 43.) Dorton and the rest of the committee hired one of those businesses, Language Testing International ("LTI"), to examine the proficiency of Baptist's interpreters and translators. (Id. at 43, 47.)

Once Baptist hired LTI, Baptist's interpreters and translators had to contact the company to set up a time for the examination. (Dorton Dep. at 52–53, Doc. 22-1.) Dorton required her interpreters, like Cathey, to take a telephone-based examination with an LTI employee. (Id. at 54.) Dorton does not know if LTI provides a live, in-person evaluation as an alternative to the telephone assessment, because she never asked. (Id.) After the oral exam, LTI would issue a certificate stating the employee's proficiency level.[2] (Dorton Dep. at 57, Doc. 19-4.)

---

[2] Later, after Cathey's departure, Baptist stopped using LTI, having found it inadequate at assessing the proficiency levels of its employees. (Dorton Dep. at 57–58, Doc. 22-1.)

On December 17, 2009, Cathey took one of these oral examinations over the telephone and received a proficiency level of "intermediate high."[3] (Cathey Dep. at 87–88, Doc. 19-1.) Cathey had trouble using the phone during the exam because of her hearing problems but does not recall whether she told Dorton about such problems. (Id. at 95–98.) At the time Cathey took this exam, Dorton and her committee had not yet determined what proficiency levels they would require for the interpreters. (Id. at 88; Doc. 19-7 (Dorton Aff.) ¶ 5.)

By 2010, however, Dorton's committee determined — independently of ACTFL or LTI — that it would require its interpreters to achieve a proficiency level of "advanced high" by January 26, 2011. (Dorton Dep. at 65–66, Doc. 19-4; Dorton Aff. ¶ 6.) On Cathey's July 26, 2010 performance review, Dorton told Cathey that she would need to raise her proficiency level to "advanced high" by January 2011, and she recommended that Cathey take Spanish language courses. (Dorton Aff. ¶ 6.) Two other Baptist interpreters, Debbie Salazar and Melissa Vaquera, also scored below "advanced high" and were told to raise their proficiency levels. (Id.)

---

[3] The ACTFL scale includes the following levels of proficiency: novice low, novice mid, novice high, intermediate low, intermediate mid, intermediate high, advanced low, advanced mid, advanced high, and superior. (Dorton Aff. ¶ 4.)

Cathey took her second telephonic exam in March 2011.[4] (Cathey Dep. at 21–22, Doc. 22-4.) The phone provided for her use had technical problems. The audio sounded "staticky," and every time she tried to adjust the volume, it would mute the conversation. (Id. at 22–23.) In addition, the telephone did not accommodate her hearing aid; she could not get the telephone close enough to her ear to use the phone, so she had to remove her hearing aid during the examination. (Id. at 24–25.) The phone she used did not comply with the FCC's requirements for someone with a hearing disability. (Id. at 25–26; Doc. 22-4 at 45–46.) When Cathey left the examination, she told one of the receptionists outside the testing room that the phone did not work properly and did not accommodate her hearing aid. (Cathey Dep. at 123–24, Doc. 22-4.)

Cathey ultimately received a proficiency score of "intermediate high," which was less than the target level of "advanced high." (Dorton Aff. ¶ 8.) However, Cathey believes she would have met her proficiency goal had the test been given through any medium besides the telephone. (Cathey Dep. at 62, 153, Doc. 22-4.) Shortly after taking the test, on March 11, 2011, Cathey participated in a conference call with Dorton and Childress, who advised Cathey that she had only scored an "intermediate high" on

---

[4] It is unclear why Baptist did not require Cathey to retake the proficiency test by January 2011, as it had initially told her.

her exam.  (Id. at 126–27.)  They told her that, since she had scored below "advanced high," she would be working as a dispatcher for the time being.  (Id. at 127–28; Dorton Dep. at 104, Doc. 22-1.)  They also told her they would get back to her as soon as they had a plan for her, but they did not eliminate the possibility that she may return to interpreting.  (Cathey Decl. ¶ 4; Dorton Dep. at 104, Doc. 22-1.)

A few days later, Cathey told Dorton about the problems she had encountered with the phone.  (Cathey Dep. at 124, 128, Doc. 22-4.)  Cathey asked Dorton whether there was some other way to do the evaluation.  (Id. at 125.)  Dorton told her that the phone-based examination was what had been established and would continue to be the standard medium used.  (Id.)[5]  Dorton suggested that Cathey brush up on her Spanish.  (Cathey Dep. at 129, Doc. 19-1.)  Cathey told Dorton that she did not feel like there was any point in taking the test again because the equipment was inadequate; she said she needed a face-to-face evaluation like the one Baptist had previously been using for the interpreters.  (Id.)  In response, Dorton said, "This is what we have in place, and this is what the department is willing to pay for."  (Id.)  Cathey did not reduce her request to writing or complain about it to Dorton's

---

[5] Dorton denies this conversation took place.  (Dorton Aff. ¶ 8.)  But on a motion for summary judgment, the court must draw all reasonable inferences, including credibility, in Cathey's favor.  Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

supervisors, Smith and Childress.  (Id. at 130–32.)

When Dorton received Cathey's results on the oral proficiency test, she also received the results for Salazar and Vaquera. (Dorton Dep. at 71–75, Doc. 22-1.)  Dorton learned that Salazar and Vaquera had also failed to achieve "advanced high" proficiency, achieving only "advanced mid."  (Id. at 75, 78.)  In response to learning of these results, Dorton decided to investigate lowering the required proficiency level and determined that one language industry organization (the National Board for Certification of Medical Interpreters) required only "advanced mid" proficiency. (Id. at 73–75.)  Acting upon Dorton's request, a subset of the committee then changed the required proficiency level to "advanced mid."  (Id. at 75.)  This change rendered Salazar and Vaquera's proficiency levels sufficient for them to continue working as interpreters but was not low enough for Cathey.  (Id. at 74–79.)

On or around March 17, 2011, Cathey was told that she had sixty days to continue working as a dispatcher, retake the telephonic proficiency test, or find another job at Baptist. (Cathey Decl. ¶ 5.)  The details of the dispatcher position were still being worked out, since the position itself had not officially been approved, and nothing was definite regarding the dispatcher position until management got back to her.  (Id.; Dorton Dep. at 104, Doc. 22-1; Doc. 19-3 (Childress Dep.) at 47.)  Dorton specifically told Cathey "to not interpret for the time being until

a resolution was achieved." (Dorton Dep. at 104, Doc. 22-1.[6]) During this time period, Cathey was paid at her interpreter pay rate. (Dorton Dep. at 90, Doc. 19-4.) On April 28, 2011, Cathey asked Childress if the deadline to decide could be shortened to May 13 instead of May 20,[7] although she was continuing to look for other jobs with Baptist and still hoping to hear back about management's plan for her future employment. (Cathey Decl. ¶ 6.) The request was granted.

On or about May 5, 2011, Smith told Cathey that her dispatcher position had been approved by human resources, but that she would only make $18.00 per hour in that position, which was less than the $21.86 per hour rate of her interpreter position. (Compl. ¶ 16; Cathey Decl. ¶ 7.) Cathey found this demotion to be "humiliating" and decided to quit rather than to accept it. (Doc. 22-4 at 39.) On May 9, 2011, Childress asked Cathey whether she was still comfortable deciding to quit; Cathey confirmed that she was comfortable with the decision, writing, "I am very excited about starting [nursing] school in the fall. I'm not excited about being 'unemployed.' If I had my 'rathers' it would be here interpreting until I retire but GOD has me securely in HIS hand

---

[6] During her deposition, Dorton was asked, "Did you ever tell [Cathey] that she could no longer interpret because she did not reach intermediate high?" She answered, "No. I — we asked her not to interpret for the time being until a resolution was achieved." (Dorton Dep. at 104, Doc. 22-1.)

[7] The reason for this request is unclear on the record provided.

and will take me where HE wants me." (Doc. 19-1 at 97; Childress Dep. at 54.) On May 11, 2011, Cathey learned that the standard had been lowered for Salazar and Vaquera; however, Cathey still declined to retake the test at the time she quit because Dorton had been "adamant" that the exam could only be taken over the telephone. (Cathey Dep. at 232, Doc. 19-1; Cathey Decl. ¶ 8.) Cathey quit her job on May 13, 2011. (Cathey Dep. at 17, Doc. 22-4.) On that day, her pay rate had not yet been decreased from the interpreter rate to the dispatcher rate. (Id. at 137.)

After Cathey quit, she approached the Equal Employment Opportunity Commission ("EEOC") about filing a charge of discrimination against Baptist. She was referred to the EEOC by an attorney who did not handle employment discrimination work. (Cathey Decl. ¶ 9.) She contacted the EEOC on or about October 4, 2011, by telephone and received a questionnaire in the mail, which she completed and returned through the mail, arriving at the EEOC on October 17, 2011. (Id.) In this intake questionnaire, Cathey did not specifically claim that Dorton had failed to make a reasonable accommodation for her hearing disability; she did, however, explain that she had to take the test on a phone that was not FCC compliant for hearing disabilities. (Cathey Dep. at 153–59, Doc. 19-1; Doc. 22-4 at 45–46.) Cathey went to the EEOC on October 31, 2011, and an EEOC official completed her charge of discrimination, which she signed. (Doc. 22-4 at 38–39.) On April

10, 2013, Cathey received a right-to-sue letter from the EEOC. (Compl. ¶ 7.)[8]

On July 8, 2013, Cathey filed a complaint in this court against Baptist, alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 et seq., by (1) failing to reasonably accommodate her disability; (2) subjecting her to disparate treatment because of her disability by removing her from her position, reducing her pay, and holding her to a higher standard than other similarly situated interpreters; (3) constructively and wrongfully discharging her from employment; and (4) engaging in items (1) and (2) intentionally and recklessly, with knowledge of the requirements of the ADA. (Id. ¶¶ 18, 22–25.)

Baptist has moved for summary judgment on Cathey's claims. (Docs. 17, 18.) Cathey has responded (Doc. 23), and Baptist has replied (Doc. 24). The motion is therefore ready for disposition.

## II.  ANALYSIS

### A.  Standard of Review

A court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[8] Cathey's complaint purports to attach a copy of the EEOC's right to sue letter and her charge of disability discrimination. (Compl. ¶¶ 6–7.)  These documents are not attached to the complaint but have been attached to other documents in the record.

Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine dispute of material fact remains. Where, as here, the non-moving party has the burden of proof, the moving party is entitled to summary judgment if it demonstrates that the non-moving party's evidence is insufficient to establish an essential element of her claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 325 (1986). But summary judgment will not be granted where the "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For the purposes of this motion, the court regards Cathey's statements as true and draws all inferences in her favor. Id. at 255. But she must establish more than the "mere existence of a scintilla of evidence" to support her position. Id. at 252. If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50. Ultimately, summary judgment is appropriate where the non-movant fails to offer evidence on which the jury could reasonably find for her. Id. at 252.

Baptist presents several grounds for dismissing Cathey's claims, which will be considered seriatim.

**B.   Failure-to-Accommodate Claim**

### 1.   Timeliness of the EEOC Charge

Baptist argues that Cathey's failure-to-accommodate claim is untimely because her EEOC charge was filed more than 180 days after

12

Baptist's alleged failure to accommodate.  Maintaining that Cathey
never requested an accommodation, Baptist argues that any claim
nevertheless accrued in March 2011 when her alleged request of
Dorton was rejected.  (Doc. 18 at 10.)  Cathey argues that she
timely filed her charge.  (Doc. 23 at 9-10.)

Cathey was required to file her EEOC charge within 180 days
of Baptist's allegedly discriminatory conduct.  See 42 U.S.C.
§ 2000e-5(e)(1) ("A charge under this section shall be filed within
one hundred and eighty days after the alleged unlawful employment
practice occurred . . . .").  Under § 2000e-5(e)(1), a plaintiff's
cause of action accrues when the employer tells the employee that
he or she will suffer an adverse employment action, and not when
the adverse action is set to take effect.  See Del. State Coll. v.
Ricks, 449 U.S. 250, 258 (1980) ("In sum, the only alleged
discrimination occurred — and the filing limitations periods
therefore commenced — at the time the tenure decision was made and
communicated to Ricks.  That is so even though one of the effects
of the denial of tenure — the eventual loss of a teaching position
— did not occur until later." (footnote omitted)); Martin v. Sw.
Va. Gas Co., 135 F.3d 307, 310 (4th Cir. 1998) ("Martin's
discrimination cause of action accrued on June 30, 1992, when
Southwestern informed him that his discharge — though not to take
effect until September 29, 1992 — was imminent.").

In this case, Cathey testified that she requested an

accommodation from Dorton in March 2011. Although Dorton allegedly rejected Cathey's specific, requested accommodation during that conversation, Dorton and Childress, in another conversation, had clearly communicated to Cathey that they were continuing to consider what position she would fill at Baptist. They also told Cathey that she would be working as a dispatcher at her current pay level until they could determine her employment future with Baptist.[9] It was not until May 5, 2011, when Cathey was told that her salary would be decreased in her new position as dispatcher that it became clear her request for an accommodation had been finally acted on by Baptist. Taking all reasonable inferences in Cathey's favor, it was not until this point that she was notified that "a resolution was achieved." (Dorton Dep. at 104, Doc. 22-1.)

It was reasonable for Cathey to believe that Dorton would take her specific request to Dorton's supervisors (Cathey Dep. at 147-48, Doc. 22-4), and that Baptist would continue engaging in a dialogue to find another type of accommodation. See Faircloth v. Goodyear Tire & Rubber Co., No. 5:13-CV-336, 2013 WL 6410233, at *2 (E.D.N.C. Dec. 9, 2013) (holding that limitations period did not commence until employee was reasonably on notice of denial of

---

[9] As noted, during her deposition, Dorton was asked, "Did you ever tell [Cathey] that she could no longer interpret because she did not reach intermediate high?" She answered, "No. I — we asked her not to interpret for the time being until a resolution was achieved." (Dorton Dep. at 104, Doc. 22-1.)

accommodation because employee reasonably relied on employer's promises to "continue to work his situation out"); <u>Chapa v. Floresville Indep. Sch. Dist.</u>, No. CIV.A. SA-10-CA-0945, 2012 WL 3062781, at *5 (W.D. Tex. July 26, 2012) ("Viewing the facts in the light most favorable to Plaintiff, Defendant has not demonstrated that prior to January 2009 Plaintiff should have reasonably known that her requests for accommodations were going to be denied."); <u>Nakis v. Potter</u>, No. 01 CIV. 10047, 2004 WL 2903718, at *15 (S.D.N.Y. Dec. 15, 2004) ("[A] claim based on a failure to accommodate does not accrue until that reasonable time has expired or the employer has irrevocably refused to make the accommodation."). Moreover, reassignment can constitute a reasonable accommodation, 42 U.S.C. § 12111(9)(B); and employers need only make any reasonable accommodation and not the employee's proposed accommodation, <u>Ansonia Bd. of Educ. v. Philbrook</u>, 479 U.S. 60, 68–69 (1986) (interpreting analogous language in Title VII religious discrimination context); <u>Fink v. Richmond</u>, 405 F. App'x 719, 723 (4th Cir. 2010) (ADA context)[10]; <u>Hollestelle v. Metro. Wash. Airports Auth.</u>, No. 97-1465, 1998 WL 228199, at *3 n.5 (4th Cir. May 8, 1998) (ADA context); <u>Stephenson v. Pfizer Inc.</u>, No. 1:13CV147, 2014 WL 4410580, at *7 (M.D.N.C. Sept. 8,

---

[10] Unpublished opinions of the Fourth Circuit are not precedential. <u>See Collins v. Pond Creek Mining Co.</u>, 468 F.3d 213, 219 (4th Cir. 2006) (recognizing that "we ordinarily do not accord precedential value to our unpublished decisions" and that such decisions "are entitled only to the weight they generate by the persuasiveness of their reasoning").

2014) (ADA context).  Therefore, the limitations period for Cathey did not commence until she was reasonably put on notice that Baptist had made a final decision on her accommodation request.

Viewing the record in the light most favorable to Cathey, a reasonable jury could determine Cathey made an accommodation request that Baptist did not finally resolve until May 2011, when she learned of her reassignment at a lower salary.  See Begolli v. Home Depot U.S.A., Inc., 701 F.3d 1158, 1160 (7th Cir. 2012) ("Statute of limitations is a defense, and in a case in which a party is entitled to, and demands, a jury trial, defenses are tried to the jury along with the case in chief. . . .  The filing deadline [for an EEOC charge] is just a defense in a Title VII suit, and there is no reason to distinguish it from other defenses and therefore exclude it from the jury trial."); Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 354 (S.D.N.Y. 2007) (concluding that genuine dispute as to when employee submitted intake form to EEOC precluded summary judgment).  Baptist's motion for summary judgment based on the timeliness of the filing of the EEOC charge as to a failure-to-accommodate claim is therefore denied.

### 2. Exhaustion

The parties also dispute whether Cathey exhausted her administrative remedies before filing suit in this court.  Under the ADA, plaintiffs must exhaust their administrative remedies by

filing a charge of discrimination with the EEOC before filing suit

in federal court. Sydnor v. Fairfax Cnty., Va., 681 F.3d 591, 593

(4th Cir. 2012). This ensures that the employer is put on notice

of the employee's complaints, allowing the employer to address the

alleged discrimination without the cost of litigation. Id. This

also allows the EEOC "the first crack at these cases," using more

efficient administrative means to reach a resolution of the

dispute. Id. But the test for exhaustion must not be so rigorous

that it "become[s] a tripwire for hapless plaintiffs," who often

initiate the administrative process without counsel. Id. at 594.

Consequently, the Fourth Circuit has set out the standard for

determining whether a plaintiff's federal complaint comes within

the scope of the prior EEOC charge as follows:

> [S]o long as a plaintiff's claims in her judicial
> complaint are reasonably related to her EEOC charge and
> can be expected to follow from a reasonable
> administrative investigation, she may advance such
> claims in her subsequent civil suit. We have therefore
> found exhaustion where both the administrative complaint
> and formal litigation concerned discrimination in
> promotions but involved different aspects of the
> promotional system, and where both the EEOC charge and
> the complaint included claims of retaliation by the same
> actor, but involved different retaliatory conduct.

Id. (citations, internal quotations marks, and brackets omitted).

In this case, Baptist argues that Cathey's EEOC charge did

not exhaust her administrative remedies because the charge failed

to allege a failure to accommodate. (Doc. 18 at 11.) This argument

is unpersuasive.

Cathey's intake questionnaire made clear that the proficiency examination took place over a phone that "**DID NOT** meet the FCC requirements for someone with a hearing disability." (Doc. 19-1 at 90 (emphasis in original).) Later, Cathey explains that she "was devastated by losing [her] job based on an evaluation that not only DID NOT test my interpreting skills but was done over the phone. A phone that was older and not up to FCC standards for people with a hearing disability." (Id. at 91.) Moreover, she noted that there "were 2 other interpreters that did not score at the required level, one of which [sic] is from Mexico; however HR lowered the standards so that those 2 interpreters could continue interpreting." (Id.) In her EEOC charge, Cathey re-alleged the same misconduct:

> On March 9, 2011, I took the proficiency test on equipment that did not meet the requirements of my disability. There were at least two other Interpreters who had fallen short of the required "Advanced High" level who had to take the test again, but they were allowed to continue working as Interpreters. Human Resources lowered the standards so that the two Interpreters could continue interpreting.

(Id. at 83.)

The gist of Baptist's argument is that neither the questionnaire nor the charge includes an allegation that Cathey made a request for an accommodation from Dorton. This is unpersuasive in light of the Fourth Circuit's holding that administrative remedies have been exhausted for "discrimination

claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996). It is clear from Cathey's EEOC filings that a failure-to-accommodate claim is at least "reasonably related to," or was likely to be "developed by reasonable investigation" of, her allegations to the EEOC.[11] Therefore, the court finds that Cathey has properly exhausted her claim.

### 3. Prima Facie Case

Under the ADA, it is unlawful for an employer to discriminate against a disabled employee who qualifies for protection under the Act. Unlawful discrimination against qualifying, disabled employees includes an employer's failure to make "reasonable accommodations" of known disabilities. 42 U.S.C. § 12112(b)(5)(A). To establish a prima facie case against an employer for failure to accommodate a disability under the ADA, an employee must establish four elements: (1) the employee was a qualified individual with a disability within the meaning of the

---

[11] Baptist argues that Cathey should be held to a higher standard because she was represented by counsel at the time she filed her EEOC charge. (Doc. 18 at 12.) Baptist cites no authority for this contention. But even assuming an elevated standard were appropriate in such cases, it would not be appropriate here. Although Cathey may have sought the advice of counsel at the time she filed her EEOC charge, there is no evidence she was actually assisted by counsel in preparing and filing it. (Cathey Decl. ¶ 9.)

statute; (2) the employer had notice of the employee's disability; (3) the employee could perform the essential functions of his or her job with reasonable accommodation; and (4) the employer refused to make such accommodations. Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013). Baptist concedes, for summary judgment purposes, that Cathey meets elements one and two and only challenges whether she has established the third and fourth elements. (Doc. 18 at 13.)

### a. Ability to Perform Essential Functions with Reasonable Accommodation

An employee bears the initial burden of establishing that he or she could perform the essential duties of the position with reasonable accommodation. Tyndall v. Nat'l Educ. Ctrs., Inc., of Cal., 31 F.3d 209, 213 (4th Cir. 1994). A qualification standard, even if related to an essential function of a job, may not be used to exclude a disabled person if she "could satisfy the criteria with the provision of a reasonable accommodation." 29 C.F.R. § 1630, App. § 1630.10(a).

Baptist argues that Cathey is not a qualified individual under the ADA because (1) achieving an "advanced mid" proficiency level on the ACTFL scale is an essential function of Cathey's job, and (2) Cathey has not shown that, with any alternate testing method, she could have achieved such a proficiency level. (Doc. 18 at 15–16.) Cathey responds that (1) the precise ACTFL proficiency level

selected by Baptist was not itself an essential function of her job, as evidenced by the fact that Baptist was willing to lower the level for other interpreters when it was expedient for Baptist to do so, and (2) that she was able to meet the required proficiency level.  (Doc. 23 at 16–17.)

The court finds that there is a genuine dispute of fact on both issues.  First, it is disputed whether achieving an "advanced mid" proficiency level is a job qualification rising to the level of an essential function of the interpreter position.  The court begins with the proposition that it will usually defer to an employer's clear decision to set a job qualification as an essential function if it is "job-related, uniformly enforced, and consistent with business necessity."  <u>Davidson v. Am. Online, Inc.</u>, 337 F.3d 1179, 1191 (10th Cir. 2003).  But before the court can agree with an employer that a job qualification is not itself discriminatory, <u>see</u> 29 C.F.R. § 1630.10(a), the employer must show that the qualification rises to the level of an essential function. The EEOC has set out several non-exhaustive factors for courts to consider in assessing whether a function or qualification rises to this level:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

Neither party has framed its analysis of the "advanced mid" proficiency requirement around these (or any other) factors. Although an employer's judgment "as to which functions are essential" is usually clear, that is not the case here. The record reflects only that Baptist initially and arbitrarily set the "advanced high" standard and then lowered it *after testing* upon discovering that the selection was too aggressive for some of its employees. There is no evidence of any other consideration, including any relationship between the proficiency standard and the actual job functions. Baptist has offered no legal authority or factual evidence that achieving a certain level of proficiency on the ACTFL scale, as determined by LTI, was itself an essential function of Cathey's job *independent* of her ability to accurately and efficiently translate between patients and medical personnel. See Riel v. Elec. Data Sys. Corp., 99 F.3d 678, 682–83 (5th Cir. 1996) (holding that employee created genuine dispute of fact as to

whether meeting milestone deadlines rather than final deadlines was an essential function of job).

The timing of the revision — a reconsideration *after* learning of its employees' results — further undermines Baptist's contention that "advanced mid" is an indisputably essential function of Cathey's job. Rather, the timing of the change supports Cathey's contention that the qualification was arbitrary and not job-related or uniformly enforced. See 29 C.F.R. § 1630, App. § 1630.2(n) ("It is important to note that the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards. . . . It should also be noted that, if it is alleged that the employer intentionally selected the particular level of production to exclude individuals with disabilities, the employer may have to offer a legitimate, nondiscriminatory reason for its selection.").

Second, even if the "advanced mid" qualification did qualify as an essential function, there is a genuine dispute as to whether Cathey could have tested at that level of proficiency with a reasonable accommodation of her hearing disability. Cathey has testified that she subjectively believes she would have met her proficiency goal had the test been given through any medium besides the telephone. (Cathey Dep. at 62, Doc. 22-4.) More importantly,

23

the undisputed facts demonstrate that before Baptist began relying on LTI — and instead used live, in-person evaluations — Cathey exceeded Baptist's required standards for her position. (See, e.g., Doc. 22-4 at 24–26 (performance evaluation showing that Cathey "exceeds standards" for "[i]nterpreting communications from Hispanic/Latino patients to Medical Center personnel" and approving her for a merit raise).) Thus, a jury could conclude that Cathey cannot meet the new standard only when the test is performed over the telephone without a reasonable accommodation.

For these reasons, Baptist's motion for summary judgment on this ground will be denied.

### b. Failure to Accommodate

For its final attack on the merits of Cathey's failure-to-accommodate claim, Baptist argues that Cathey failed to inform Baptist "of *both* the disability and [her] need for accommodations for that disability." (Doc. 18 at 13 (quoting Schneider v. Giant of Md., LLC, 389 F. App'x 263, 270 (4th Cir. 2010)).) Baptist essentially urges the court to discredit Cathey's sworn deposition testimony that she told Dorton about her hearing disability and specifically requested a testing accommodation from Dorton. It would be inappropriate, however, for the court to grant Baptist's motion for summary judgment on this basis.[12]

---

[12] Baptist has not argued that it granted Cathey a reasonable accommodation, whether in the form of hearing aids, reassignment, or

Cathey has pointed to sufficient evidence that would allow a reasonable jury to conclude that she informed Baptist of her hearing disability and of her need for a testing accommodation. Baptist was aware of Cathey's hearing disability because (1) it paid 90% of the purchase price of her hearing aids; (2) Dorton witnessed Cathey's hearing problems; (3) Cathey had complained to Dorton about her hearing problems; and (4) Dorton provided Cathey with a hearing device. (Cathey Dep. at 97–108, Doc. 22-4; Dorton Dep. at 80–82, Doc. 19-4.) Baptist was also on notice that Cathey had requested an accommodation for the proficiency test because, after her March 2011 test, Cathey told Dorton, her immediate supervisor, that she could not hear well enough through the telephone and that she would prefer to return to an in-person evaluation — a request that Dorton expressly rejected. (Cathey Dep. at 124–25, Doc. 22-4; Cathey Dep. at 129–32, Doc. 19-1.)

Baptist and Dorton deny that these conversations with Cathey occurred. However, on a motion for summary judgment, the court must draw all reasonable inferences in favor of Cathey, including reasonable credibility inferences. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) ("In considering a motion for summary judgment,

---

otherwise. (See Doc. 18 at 13–15.) Rather, it has focused its argument on Cathey's alleged failure to provide notice of her need for accommodation. (See id. at 14 ("Here, Cathey cannot show that [Baptist] refused to make accommodations, as she cannot demonstrate that she adequately put [Baptist] on notice of her need for an accommodation with respect to the March 2011 [proficiency exam] because of her hearing condition.").)

the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed." (citation omitted)). Based on the evidence Cathey has presented, a reasonable jury could conclude that Baptist refused to make a reasonable accommodation of her hearing disability. Therefore, Baptist's motion to dismiss the failure-to-accommodate claim will be denied.

### C.   Wrongful & Constructive Discharge

Cathey claims that Baptist constructively, and thus wrongfully, discharged her on account of her disability. (Compl. ¶ 18; Doc. 23 at 12.) Baptist denies that it took any actions amounting to constructive discharge.

A prima facie case of wrongful discharge requires the plaintiff to demonstrate four elements: (1) presence within the ADA's protected class; (2) discharge; (3) performance of the job at a level that met the employer's legitimate expectations at the time of discharge; and (4) circumstances surrounding the discharge that raise a reasonable inference of unlawful discrimination. Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir. 2001). Because Cathey was not actually discharged but quit, she seeks to prove the discharge element on a constructive discharge theory.

Baptist only disputes the discharge element.[13]

To demonstrate that an employer's actions amount to constructive discharge, a plaintiff must show two elements: "(1) that the employer's actions were deliberate, and (2) that working conditions were intolerable." Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 262 (4th Cir. 2006). On the first element, an employer's actions only qualify as deliberate "if they 'were intended by the employer as an effort to force the plaintiff to quit.'" Id. (quoting Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 272 (4th Cir. 2001)). Such an intent "can be proven by actual or circumstantial evidence, including evidence of 'actions that single out a plaintiff for differential treatment.'" Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994) (quoting Johnson v. Shalala, 991 F.2d 126, 131 (4th Cir. 1993)). On the second element, "[w]hether an employment environment is intolerable is determined from the objective perspective of a reasonable person," but "mere dissatisfaction with work assignments, a feeling of being

---

[13] In a footnote, Baptist states, "Due to the overlapping evidence, [Baptist] relies on its constructive discharge arguments for purposes of also showing that there was no reasonable inference of unlawful discrimination with respect to Cathey's discharge — a required element of Cathey's prima facie case." (Doc. 18 at 18 n.5.) This footnote argument puts the court in the difficult position of imagining what a party would have argued about an issue, which the court is in no position to do. Baptist has not carried its burden on this unexplained argument, and therefore the court declines to grant summary judgment on this basis. See Nw. Nat. Ins. Co. v. Baltes, 15 F.3d 660, 662–63 (7th Cir. 1994) (declining invitation of "[l]awyers and litigants who decide that they will play by rules of their own invention").

unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Heiko, 434 F.3d at 262 (citations and internal quotation marks omitted).

The Fourth Circuit has made clear that not every adverse employment action will rise to the level of constructive discharge. For example, while "[d]emotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal," merely a "slight decrease in pay coupled with some loss of supervisory responsibilities" does not amount to constructive discharge. Carter, 33 F.3d at 459 (citations and internal quotation marks omitted). Moreover, an employer's failure to accommodate a disability does not automatically create a claim of constructive discharge, although possibly a "complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge." Johnson v. Shalala, 991 F.2d 126, 132 (4th Cir. 1993).

In this case, Cathey has not presented sufficient evidence on either prong. Cathey's only evidence of deliberateness is that Baptist lowered the proficiency standard to a level that allowed her two, non-disabled co-workers to continue interpreting. However, the evidence is not that the proficiency level was not also lowered for Cathey but that Cathey would have preferred the

standard be lowered two notches further to match her assessed ACTFL level.  Though this could be seen as an effort to induce Cathey to accept a slight demotion, it is insufficient evidence of Baptist's specific intent to force Cathey to quit.

Cathey also fails to show that a reasonable person would have found her demotion so intolerable that she would have quit.  See Carter, 33 F.3d at 459 ("The doctrine of constructive discharge protects an employee 'from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers.'" (quoting Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)). Cathey was reassigned to work as a dispatcher, and her pay was decreased about four dollars per hour, a reduction of about eighteen percent (with no apparent change in employer benefits). Cathey apparently does not believe that merely being reassigned to work as a dispatcher constituted constructive discharge.  She was asked this question directly during her deposition:

> Q.  If the dispatcher pay had been equivalent to the interpreter pay, would you have stayed?
>
> A.  Yes.

(Cathey Dep. at 226, Doc. 25-1.)  Cathey points to no reason why the change in pay, even taken together with the apparently acceptable reassignment, is so "unreasonably harsh" so as to cause a reasonable person to quit.

In light of the fact that Baptist found Cathey a new position and subsidized ninety percent of the cost of her hearing aid, no reasonable jury could conclude that the decrease in Cathey's hourly wages was a deliberate attempt to force her to quit, or that a reasonable person would find such treatment intolerable. The reduction was not tantamount to being actually fired. There is no genuine dispute of material fact on the wrongful discharge claim, and Baptist is entitled to judgment as a matter of law on it.[14]

### D.   Disparate Treatment Claim

Cathey claims that Baptist treated her less favorably than other similarly situated co-workers on account of her hearing disability. (Compl. ¶ 24 ("Defendant subjected Cathey to disparate treatment by removing her from her position, reducing her pay, and holding her to higher standards than similarly situated non-disabled employees.").) Baptist has focused its motion for summary judgment on Cathey's other claims for failure to accommodate (id. ¶ 23) and wrongful (constructive) discharge (id. ¶ 18). In a footnote, however, Baptist briefly argues that Cathey's claim, that her removal from the interpreter position constituted disparate treatment, is time-barred and lacks support in the record. (See Doc. 18 at 19 n.6.)

---

[14] Because the court has dismissed the wrongful discharge claim on the merits, it need not reach Baptist's statute-of-limitations defense. (See Doc. 18 at 17.)

Although it is tempting for a party to downplay a claim by relegating discussion of it to a footnote, it is not the court's job to undertake the analysis and legal research needed to support such a perfunctory argument. Lab. Corp. of Am. Holdings v. Kearns, No. 1:14CV1029, ___ F. Supp. 3d ___, 2015 WL 413788, at *10 (M.D.N.C. Jan. 30, 2015) (quoting Hayes v. Self-Help Credit Union, No. 1:13-CV-880, 2014 WL 4198412, at *2 (M.D.N.C. Aug.22, 2014)); see also Local Rule 7.2(a) (requiring litigants to refer to statutes, rules, and authorities in support of their arguments); Cross Med. Products, Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1320 n.3 (Fed. Cir. 2005) (refusing to address an undeveloped argument raised in a footnote); Hughes v. B/E Aerospace, Inc., No. 1:12-cv-717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do.").

On this record, there is simply not sufficient argument, factual or legal, to provide the court any guidance as to the substance of the contention. Therefore, to the extent this footnote constituted an argument for summary judgment, it is not properly presented and will be denied without prejudice.[15]

---

[15] Because this denial is on procedural grounds, the court makes no conclusion as to the merits of any disparate treatment claim.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Baptist's motion for summary judgment (Doc. 17) be GRANTED in part and DENIED in part, and that judgment be GRANTED for Baptist as a matter of law on Cathey's claim that she was wrongfully (constructively) discharged on account of her disability, which is DISMISSED WITH PREJUDICE, and that Baptist's motion otherwise be DENIED.

  /s/   Thomas D. Schroeder
United States District Judge

March 12, 2015